2020 IL App (1st) 190854

SIXTH DIVISION
November 20, 2020

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-19-0854

| | | |
|---|---|---|
| BINO OOMMEN, M.D., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 18 L 4985 |
| GLEN HEALTH AND HOME MANAGEMENT INC.; | ) | |
| BRENTWOOD NORTH HEALTHCARE AND | ) | |
| REHABILITATION CENTRE, INC.; SIDNEY GLENNER; | ) | Honorable |
| JOSHUA RAY; and PHILIP THOMPSON, | ) | Jerry A. Esrig, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justice Harris concurred in the judgment and opinion.
Justice Griffin specially concurred, with opinion.

**OPINION**

¶ 1    Dr. Bino Oommen's privileges to practice medicine at defendants' nursing facility were terminated following his cooperation in the investigation of the death of one of the facility's residents. We are asked to decide in this case whether the doctor has legal recourse under the Whistleblower Act (Whistleblower Act or Act) (740 ILCS 174/1 *et seq.* (West 2014)) or can assert common law claims for retaliatory discharge against the nursing home, its parent company, and the individuals he claims were responsible for terminating his privileges. The circuit court granted summary judgment in defendants' favor on all counts. For the reasons that follow, we affirm in part and reverse in part.

¶ 2                                I. BACKGROUND

¶ 3     Defendants in this case are Brentwood North Healthcare and Rehabilitation Centre, Inc. (Brentwood North)—a nursing and rehabilitation facility located in Riverwoods, Illinois; Brentwood North's administrator, Philip Thompson; Brentwood North's parent company, Glen Health and Home Management Inc. (Glen Health); Glen Health's president, Sidney Glenner; and Glen Health's director of operations, Joshua Ray. The plaintiff, Dr. Oommen, is a physician licensed to practice medicine in the State of Illinois who, prior to July 8, 2015, had privileges to treat patients at Brentwood North. Pursuant to a consulting agreement, Dr. Oommen also served as a corporate medical advisor to Glen Health.

¶ 4     Although defendants object to, and disagree with, many of the purported facts set out in Dr. Oommen's appellate brief, they have elected not to file an opposing statement of facts because, in their view, the issues on appeal present questions of law not directly bearing on the circumstances surrounding the death of Dr. Oommen's patient, the ensuing investigation, or defendants' motivations for terminating the doctor's privileges at Brentwood North. We agree and, for purposes of this opinion, take Dr. Oommen's allegations regarding those matters as true. Because many of the facts recited by Dr. Oommen are also only relevant to his attempts to pierce the corporate veil, a theory we have no need to consider, those facts are omitted here.

¶ 5     Dr. Oommen alleged that one of his patients at Brentwood North, Harry Cavicchioni, was assessed by him as a "high fall risk," a finding that, according to the doctor, should have prompted Brentwood North's employees to create and follow a care plan to minimize that risk. On June 21, 2015, however, Mr. Cavicchioni suffered a fall in the nursing home's common area. Dr. Oommen instructed Brentwood North's staff by text message to "Send [Mr. Cavicchioni] to ER stat for evaluation." He claimed that, "[a]fter an initial delay," the nursing home's staff "eventually" and

"reluctantly" transferred Mr. Cavicchioni to a nearby hospital "by a private ambulance and not 911," where Mr. Cavicchioni was diagnosed with an acute subdural hematoma (a blood clot between the surface of the brain and its outer covering). According to Dr. Oommen, following this incident, Mr. Cavicchioni's "quality of life quickly declined[,] and he remained in hospice care until his eventual death on July 6, 2015."

¶ 6    Dr. Oommen further alleged that Brentwood North's administrator, Mr. Thompson, caused the Lake County Coroner's office to be told that Mr. Cavicchioni's "sole diagnosis at death was dementia" and knowingly omitted any information about the patient's fall, even when specifically asked by the deputy coroner about recent falls, fractures, or trauma. Upon learning of this, Dr. Oommen informed the coroner's office that the correct cause of death was "an acute subdural hematoma secondary to a fall."

¶ 7    A subsequent investigation into the matter by the Illinois Department of Public Health (IDPH) resulted in a $25,000 fine against Brentwood North, and the nursing home agreed to pay Mr. Cavicchioni's family $175,000 in exchange for a release of their claims against the facility. Dr. Oommen cooperated with the IDPH's investigation, telling the agency that, in his opinion, the proximate cause of Mr. Cavicchioni's fall and death was the failure of Brentwood North's employees to properly supervise him.

¶ 8    According to Dr. Oommen, on the day after Mr. Cavicchioni's death, Mr. Thompson promised the doctor that " 'more patients will be coming your way' " if he agreed to help the nursing home conceal the true cause of Mr. Cavicchioni's death. Dr. Oommen ended that conversation, telling Mr. Thompson that what he proposed was "unethical, immoral, and criminal." In the days that followed, Mr. Thompson confronted Dr. Oommen via text message about what the doctor had told the coroner's office and finally asked the doctor for a meeting. When Dr.

Oommen asked what the meeting would concern, Mr. Thompson wrote, "Credentials at Brentwood." Dr. Oommen agreed to meet "with a third party present for legal purposes," prompting the following response from Mr. Thompson:

"This is why we have to part ways. On [August] 10th I am removing your credentialing and all privileges there in [sic] for brentwood north. I will be sending you a patient list so that you can approach family members and residents to transfer to a facility you are credentialed at. Please [let] me know if there is anyway [sic] I can assist. After [August] 10th, you will not be permitted to practice here. I wish you well."

¶ 9     Dr. Oommen alleged that Mr. Thompson acted "in concert with" Mr. Glenner and Mr. Ray to terminate his privileges to see patients at Brentwood North and that Mr. Glenner and Mr. Ray also terminated Dr. Oommen from his position as Glen Health's corporate medical advisor. Dr. Oommen brought claims against defendants under the Whistleblower Act and for common law retaliatory discharge.

¶ 10     On August 29, 2018, the circuit court granted defendants' motion to dismiss the complaint, in part, on the basis that Dr. Oommen had failed to state a claim for retaliatory discharge against the individual defendants. The court agreed with defendants that the only proper party to such a claim is a plaintiff's former employer, not the agents who may have acted on the employer's behalf.

¶ 11     The court disposed of Dr. Oommen's remaining claims on March 28, 2019, when it granted defendants' motion for summary judgment. The circuit court dismissed the retaliatory discharge claim against Brentwood North and Glen Health on the basis that Dr. Oommen had failed to make a *prima facie* case that he was an employee of either entity, which was a necessary component of the claim. The court pointed out that Dr. Oommen had "acknowledge[d] that he signed a contract characteristic of an independent contractor" and rejected the doctor's argument that he was a

*de facto* employee under the multifactor analysis that looks beyond such labeling by the parties. The court found no evidence that defendants had either reserved the right to control or actually controlled the manner in which Dr. Oommen practiced medicine. In the court's view, Dr. Oommen's arguments—that "defendants tried repeatedly, and generally unsuccessfully, to influence his treatment decisions" and that they "sometimes ignored his decisions or orders and went around him to accomplish their objectives"—in fact demonstrated "the opposite of control."

¶ 12     The circuit court also concluded that Dr. Oommen lacked standing to bring claims under the Whistleblower Act. For the same reasons that he was not an employee for purposes of a retaliatory discharge claim, he was not an "employee" under the Act, to the extent the Act defines an employee as "any individual who is employed on a full-time, part-time, or contractual basis by an employer." 740 ILCS 174/5 (West 2014). As the court acknowledged, the statutory definition was expanded in 2011 to also include licensed physicians who practice medicine in facilities "funded, in whole or in part, by the State" (Pub. Act 96-1253 (eff. Jan. 1, 2011) (amending 740 ILCS 174/5)). However, the court agreed with defendants that neither Brentwood North nor Glen Health received state funding within the meaning of the Act. In so ruling, the court was bound to follow *Larsen v. Provena Hospitals*, 2015 IL App (4th) 140255, ¶ 60, in which another district of this court concluded that Medicaid payments—which Brentwood North does receive—are mere payments for services and not "funding" designed to advance a specific project in the public interest.

¶ 13     As an additional ground for rejecting Dr. Oommen's retaliatory discharge claim, the court found that the doctor had not been "discharged" by the termination of his medical staff and admitting privileges, as neither of those conferred employment.

¶ 14     Dr. Oommen now appeals.

¶ 15                                    II. JURISDICTION

¶ 16     The circuit court's order granting defendants' motion for summary judgment on March 28, 2019, fully and finally resolved all remaining claims in this matter. On April 23, 2019, plaintiff filed a timely notice of appeal from that order and from the court's earlier interlocutory ruling on defendant's motion for a partial dismissal. We have jurisdiction over this matter pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments by the circuit court in civil cases.

¶ 17                                    III. ANALYSIS

¶ 18     On appeal, Dr. Oommen challenges the circuit court's rulings on defendants' dispositive motions—a motion for partial dismissal under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 2-615 (West 2018)) and a motion for summary judgment under section 2-1005(b) (735 ILCS 5/2-1005(b) (West 2018)). Our review of both orders is *de novo*. *Doe v. Coe*, 2019 IL 123521, ¶ 20; *Pielet v. Pielet*, 2012 IL 112064, ¶ 30.

¶ 19                              A. Retaliatory Discharge

¶ 20                    1. The Individual Defendants Were Not Proper Parties

¶ 21     We first address Dr. Oommen's argument that the circuit court erred when it dismissed his retaliatory discharge claims against the individual defendants. That ruling was, as the doctor acknowledges, based on controlling authority holding that a plaintiff's former employer—and not the employer's agents—is the only proper party to such a claim. *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 22 (1998). Dr. Oommen characterizes the reasoning underlying this rule as "naïve" because it "allows a tortfeasor to use the corporate fiction as a shield for personal liability." Requiring a discharged employee to pierce the corporate veil before asserting such claims is, in Dr. Oommen's view, "an entirely unnecessary additional hurdle." In support of

this argument, he draws our attention to the laws of New Jersey, Arizona, and West Virginia, which all recognize some form of individual liability for retaliatory discharge. See *Ballinger v. Delaware River Port Authority*, 800 A.2d 97, 110 (N.J. 2002); *Higgins v. Assmann Electronics, Inc.*, 173 P.3d 453, 458 (Ariz. 2007); *Harless v. First National Bank in Fairmont*, 289 S.E.2d 692, 699 (W. Va. 1982). Defendants argue in response that the reasoning in *Buckner* is as compelling today as it was 20 years ago and the holding in that case, arrived at after careful consideration of a split in authority, should be viewed as settled law under the doctrine of *stare decisis*.

¶ 22    Defendants also argue that Dr. Oommen effectively abandoned this claim by failing either to seek an interlocutory appeal from the circuit court's dismissal order or to incorporate the claim by reference in his amended complaint. See *Vilardo v. Barrington Community School District 220*, 406 Ill. App. 3d 713, 719 (2010) (discussing a party's options when faced with such a ruling). Dr. Oommen acknowledges this oversight but notes that the judge in this case treated the claim as if it had been preserved, concluding his summary judgment order by stating, "[f]inally, the individual defendants cannot be held liable for retaliatory discharge."

¶ 23    We need not decide whether the claim was abandoned because, even if it was not, all of the arguments the parties raise are ones properly addressed only to our supreme court. As an intermediate appellate court, we are bound by controlling precedent. See *Illinois Labor Relations Board v. Chicago Transit Authority*, 341 Ill. App. 3d 751, 758 (2003) ("only the supreme court has the authority to overrule or modify its decisions"). Accordingly, we affirm the circuit court's dismissal of Dr. Oommen's retaliatory discharge claims against Mr. Glenner, Mr. Ray, and Mr. Thompson.

¶ 24        2. Dr. Oommen Made No *Prima Facie* Case That He Was an Employee

¶ 25    Dr. Oommen also argues that the circuit court should not have granted summary judgment

in favor of the corporate defendants, Brentwood North and Glen Health, on his claim for retaliatory discharge. Summary judgment is proper where the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See 735 ILCS 5/2-1005 (West 2018).

¶ 26    A defendant may move for summary judgment in one of two ways: (1) by affirmatively demonstrating that some element of the case must be resolved in the defendant's favor or (2) by filing a motion—of the type recognized by the United States Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)—that points out an absence of evidence supporting one or more elements of the plaintiff's claim. *Willett v. Cessna Aircraft Co.*, 366 Ill. App. 3d 360, 368-69 (2006). In the case of a *Celotex* motion, if the defendant carries its initial burden of production, the burden then shifts to the plaintiff to establish facts supporting each element of the claim. *Id.* at 369. "While parties opposing a summary judgment motion are not required to prove their case, they are under a duty to present a factual basis which would arguably entitle them to judgment in their favor, based on the applicable law." (Internal quotation marks omitted.) *Id.*

¶ 27    Although the general rule in Illinois is that "an employer may discharge an employee-at-will for any reason or for no reason" (internal quotation marks omitted), our supreme court has recognized "a limited and narrow cause of action for the tort of retaliatory discharge." *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 505 (1991). To succeed on such a claim, a plaintiff must establish that (1) he was an employee, (2) he "was dismissed in retaliation for his activities," and (3) the dismissal was "in contravention of a clearly mandated public policy." *Id.*

¶ 28    Here, the circuit court concluded that Dr. Oommen failed to make a *prima facie* case that he was an employee of either Brentwood North or Glen Health. As this court has noted, "there is no rigid rule of law governing the determination of whether an employer-employee relationship

exists." *Netzel v. Industrial Comm'n*, 286 Ill. App. 3d 550, 553-54 (1997). A number of factors typically bear on such a determination, including "the method of payment; the work schedule; the right to discharge; who provides tools, materials or equipment; the skill required in the work to be done; whether the worker's occupation is related to that of the employer; and who deducts or pays for insurance, social security and taxes." *Id.*

¶ 29 The "single most important factor in determining the parties' relationship," however, is "the right to control the work." *Id.* As our supreme court has explained:

" 'An independent contractor is one who renders service in the course of an occupation representing the will of the person for whom the work is done only as to the *result* of the work and not as to the *means* by which it is accomplished, [citation] and is one who undertakes to produce a given result without being in any way controlled as to the method by which he attains that result. *** The test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent.' " (Emphasis added.) *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 31 (quoting *Hartley v. Red Ball Transit Co.*, 344 Ill. 534, 538-39 (1931)).

¶ 30 As defendants point out, "[t]he granting of medical staff privileges merely demonstrates [a medical facility's] determination that a physician's credentials are such that he or she is qualified to practice medicine at the hospital" and does not, in and of itself, confer employment. *Bryant v. Glen Oaks Medical Center*, 272 Ill. App. 3d 640, 651 (1995). Dr. Oommen also does not dispute that his credentialing packet and the contracts he entered into with both Brentwood North and Glen Health all indicated that he was to be an independent contractor. The Corporate Medical Advisor Agreement with Glen Health expressly states that "[t]he facility and the Medical Advisor agree

that their relationship is that of independent contractors and not of employer and employee or principal and agent." Dr. Oommen's contract with Brentwood North, though referenced a number of times, does not appear in the record. But in his affidavit Dr. Oommen agreed with statements made in an earlier affidavit submitted by Mr. Thompson in support of defendants' motion to dismiss that "[a]t Brentwood, all physicians work[ed] as independent contractors," that "[i]n October of 2008, [Dr. Oommen] signed a Medical Director Agreement with Brentwood as an independent contractor physician with the facility," and that "[i]n February of 2012, [he] signed a Corporate Medical Advisor Agreement with Glen Health *** as an independent contractor with the facility."

¶ 31     Dr. Oommen's argument is not that defendants formally reserved the right to control him, but that they *actually* controlled him, treating him as a *de facto* employee. In this regard, he urges us to find the facts of his case analogous to those in *Netzel*, where we held a finding that a workers' compensation claimant was an independent contractor, and not an employee, was against the manifest weight of the evidence. *Netzel*, 286 Ill. App. 3d at 554-55. Although we noted that the claimant's job as an unlicensed private duty nurse at the respondent's nursing home "contained elements of both an independent contractor and an employee relationship," we concluded that the weight of the evidence supported the conclusion that she was an employee. *Id.* at 554. The claimant in *Netzel* was not just subject to regulations governing the work she did. Rather, "the entire scope of her work and day were controlled by [the nursing home]," which "regulated [her] movement from the time she entered its doors." *Id.* The nursing home provided the claimant with all of the equipment she was to use to perform her duties, a head nurse gave her regular instructions regarding the care of her patients and directly supervised her for more complex tasks, and the claimant was required to provide a verbal report to the nurse in charge when she left for the day.

*Id.* We concluded that these requirements—set out in the nursing home's "private duty nurse instruction sheet" and the violation of which could result in termination—demonstrated that the facility "not only had the theoretical right to control," but "did in fact control [the] claimant's activities and the method and manner in which she performed her duties." *Id.* at 554-55.

¶ 32    Dr. Oommen's efforts to cast his experience at Brentwood North in a similar light fall flat. In the affidavit he submitted in opposition to summary judgment, for example, Dr. Oommen detailed a number of instances in which defendants ignored his medical decisions. When he ordered an expensive medication or manner of administering a medication, for example, defendants required "corporate" approval first and would often carry out a less expensive alternative intervention or simply fail to follow his instructions at all. Dr. Oommen claimed that, contrary to his orders, defendants would also delay the transfer of patients into or out of the nursing home in order to maximize payments. All that these examples show, however, is that *Dr. Oommen* had little control over *defendants*' actions once he had rendered his medical opinions and issued his orders concerning a patient's treatment. They do not demonstrate that defendants controlled or reserved the right to control the manner or methods in which Dr. Oommen performed his duties as a doctor.

¶ 33    Dr. Oommen also maintained in his affidavit that defendants created a paper trail to make it look like he had signed off on things he had not, in some cases causing his patients to receive different medications than the ones he prescribed and to be seen by hospice doctors he had not referred them to. But again, such conduct—though certainly troubling—is not evidence of the nursing home's day-to-day control over the method and manner in which Dr. Oommen did his job.

¶ 34    Instances Dr. Oommen recounted in which Mr. Thompson attempted to instruct the doctor on how to answer questions from government investigators or how to refer to things in his medical

records were, as the circuit court noted, at most *failed* attempts at actual control. Dr. Oommen stated in his affidavit that he "refused [the] attempt at coaching," and made clear to Mr. Thompson that he "wasn't going to change the language in [his] charting."

¶ 35     Dr. Oommen also recounted ways in which he claimed defendants treated him like a "company doctor" and required him to do tasks that were not only outside the scope of his agreements with them but sometimes outside the traditional practice of medicine. According to Dr. Oommen, defendants required him to serve as a "back up doctor" to other physicians credentialed at the nursing home; asked him to write prescriptions for Mr. Ray, Mr. Glenner, and Mr. Glenner's wife without examining them first; required him to perform employee health checks on defendants' staff; and, on various occasions, required him to perform unskilled labor like moving oxygen tanks and cleaning exam rooms. Dr. Oommen insists, with no explanation, that defendants "would not have instructed an independent contractor to perform these tasks." This argument is misplaced. It is not the assignment of tasks that is the hallmark of an employment relationship, but the right to control the *manner* in which those tasks are carried out. If defendants were not abiding by the terms of their contracts, Dr. Oommen's recourse was a claim for breach of contract. Their assignment of new or different responsibilities is not evidence that they controlled or reserved the right to control the manner and methods by which Dr. Oommen practiced his profession.

¶ 36     Although Dr. Oommen also averred that, when seeing patients at Brentwood North, he wore a lab coat bearing Glen Health's logo rather than the name of his own practice, kept patient medical records at Brentwood North, and used Brentwood North's address as his own mailing address, we find that these facts, largely matters of convenience, are insufficient on their own to constitute *prima facie* evidence of an employment relationship. Dr. Oommen was not prohibited,

like the physician in *Thede v. Kapsas*, 386 Ill. App. 3d 396, 401 (2008), from practicing medicine elsewhere. Indeed, the record reflects that he enjoyed privileges to see patients at seven other facilities, was not on Brentwood North's payroll, and received no employee benefits.

¶ 37    Finally, although we question defendants' characterization of the statement as a "judicial admission" (see *National Union Fire Insurance Co. of Pittsburgh v. DiMucci*, 2015 IL App (1st) 122725, ¶ 2 (noting that "[s]tipulations are judicial admissions in the case in which they are made" and "are admissible in other cases as evidentiary admissions")), it is worth noting that Dr. Oommen described himself as "an independent practitioner with clinical privileges" at Brentwood North in a report he provided in support of the lawsuit filed against the facility by Mr. Cavicchioni's estate. This statement—as well as the parties' agreement under their contracts that Dr. Oommen would serve as an "independent practitioner"—further militates against any possible finding that he was, in fact, an employee for purposes of a claim of retaliatory discharge.

¶ 38    We agree with the circuit court that Dr. Oommen failed to submit evidence reflecting a degree of control over the method or manner in which he practiced his profession that created an issue of fact as to his employee status. Because employee status is a threshold requirement for a claim of retaliatory discharge, judgment in defendants' favor on this claim was proper.

¶ 39    In light of this holding, it is unnecessary for us to consider, as the circuit court in this case went on to do, whether the termination of Dr. Oommen's privileges to practice medicine at Brentwood North qualified as a "discharge."

¶ 40              B. Dr. Oommen Has Standing Under the Whistleblower Act

¶ 41    Dr. Oommen argues that the circuit court erred when it concluded that he lacked standing to bring various claims against defendants under the Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2014)), legislation that, among other things, protects employees from retaliation for

"disclosing information to a government agency that the employee reasonably believes violate[s] a state or federal law, rule, or regulation" (*Roberts v. Board of Trustees of Community College District No. 508*, 2019 IL 123594, ¶ 40).

¶ 42      Although only employees may avail themselves of the Act's protections, in 2011 the Act's definition of "employee" was expanded beyond the common law definition to also include "a licensed physician who practices his or her profession, in whole or in part, at a hospital, nursing home, clinic, or any medical facility that is a health care facility funded, in whole or in part, by the State." Pub. Act 96-1253 (eff. Jan. 1, 2011) (amending 740 ILCS 174/5). The circuit court concluded that Dr. Oommen did not come within this expanded definition because Brentwood North was not "funded, in whole or in part, by the State." However, both Dr. Oommen and the Illinois Trial Lawyers Association (ITLA), which was permitted to file an *amicus curiae* brief in this matter, make several arguments in favor of an understanding of this expanded definition that would include the doctor in this case. For the reasons that follow, we agree that this expanded definition does include Dr. Oommen.

¶ 43      We must first address—and reject—Dr. Oommen's cursory and unsupported argument that the circuit court was wrong to even consider whether Brentwood North was "a health care facility funded, in whole or in part, by the State." Dr. Oommen suggests that, properly read, the clause only modifies the last item in the list, "any medical facility," and not any of the preceding items, including "nursing home." Although Dr. Oommen does not refer to it by name, the rule he attempts to invoke is the "last antecedent rule." This is a rule of statutory construction that our supreme court has frequently applied (*Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund of Chicago*, 95 Ill. 2d 211, 216-17 (1983)), and particularly where the modifying clause is not separated from the listed items by a comma (*In re E.B.*, 231 Ill. 2d 459, 468 (2008)). The rule is

not without its limitations, however. As Justice Kagan noted in *Lockhart v. United States*, 577 U.S. ___, ___, 136 S. Ct. 958, 963 (2016) (Kagan, J., dissenting, joined by Breyer, J.), the rule "can assuredly be overcome by other indicia of meaning." (Internal quotation marks omitted.) She went on to explain that where the listed items are simple, parallel, and of the type a reader would expect to see together—the example she gave was "the laws, the treaties, and the constitution of the United States"—the reader will intuitively apply the final modifier to each item in the list. (Internal quotation marks omitted.) *Id.* at ___ n.2, 136 S. Ct. at 972 n.2. Such is the case here, where the listed items are hospital, nursing home, clinic, or any medical facility. We also view the last item, "any medical facility" as a catch-all incorporating each of the items listed before it. The circuit court was entirely correct to consider whether Brentwood North was "a health care facility funded, in whole or in part, by the State."

¶ 44    In our own consideration of this question, Dr. Oommen urges us to begin with the amendment's legislative history. In particular, he directs us to the following exchange, just preceding a unanimous vote in favor of the amendment by the Illinois House of Representatives, between state Representative Ken Dunkin and the amendment's sponsor, Representative Elaine Nekritz:

> "NEKRITZ: *** Under existing law, the Whistleblower Act protects those who report misdeeds only if you're an employee. And the purpose of [House Bill 6231] is to extend that to those that might also serve on a medical staff even though there isn't an employer-employee relationship. In a lot of ways, doctors and other health care professionals are in a very good position to see if there's Medicaid or Medicare fraud going on. But *** if they report they're not protected under the Whistleblower Act. There is actually a case out there ongoing right now where a doctor did report and did suffer some

retribution as a result. And so, this would protect the people in that position.

* * *

DUNKIN: *** [H]ow would something like this apply to a private hospitals [*sic*] who are in similar situations or find themselves in a similar situation to a public hospital?

NEKRITZ: I don't think the Bill distinguishes between public and private hospitals. It's anyone *** practicing at a hospital, nursing home, clinic or medical facility.

DUNKIN: Well, according to my analysis …

NEKRITZ: Oh.

DUNKIN: … they would allow doctors on staff at a state-funded hospital or medical facility …"

NEKRITZ: Well, it's … it's if they're funded in whole or in part by the state. So, you know, I don't know that there… if they're … if they're not accepting any public money any … they're not accepting a single Medicaid or single Medicare participant then I could imagine that they would be excluded, but I don't know how many facilities out there that are like that.

DUNKIN: So, you're saying, this does apply to private, not-for-profit or for-profit hospitals?

NEKRITZ: As long as they're taking some public funding.

DUNKIN: Thank you." 96th Ill. Gen. Assem., House Proceedings, Mar. 17, 2010, at 98-99 (statements of Representatives Nekritz and Dunkin).

¶ 45 We agree that this exchange evidences an intent to consider a private healthcare facility to be "funded, *** in part, by the State" if that facility accepts even one payment from a State-funded program like Medicaid. We reject defendants' argument that Dr. Oommen forfeited his ability to

cite this transcript because he did not expressly rely on it in the circuit court or focus there on the legislative history of the amendment. "We require parties to preserve issues or claims for appeal; we do not require them to limit their arguments here to the same arguments that were made below." *Brunton v. Kruger*, 2015 IL 117663, ¶ 76. In the circuit court, Dr. Oommen incorporated into his summary judgment response brief the argument, first made in his opposition to defendants' motion to dismiss, that under the Act's expanded definition of "employee," Brentwood North was a medical facility "funded, in whole or in part, by the State" because it accepted Medicaid payments. And at the hearing on defendants' motion, Dr. Oommen's counsel plainly argued "[i]f you read the legislative history, it's clear that the only state funding necessary in order to invoke the protection of the Whistleblower Act is Medicaid and Medicare; and it's undisputed in this instance that the defendants received both Medicare and Medicaid payments." This sufficiently preserved the issue for appeal. Dr. Oommen is free on appeal to reassess the strengths of his arguments in support of a ruling in his favor on that issue, and we will not strictly limit him to the sources he cited in his briefs below or preclude him from reassessing his best arguments. Indeed, it would have been surprising for Dr. Oommen to focus on this argument in the circuit court, where the judge was bound by *Larsen*'s contrary reading of the amendment, a reading we are free to disagree with. We find no grounds for forfeiture here.

¶ 46 We likewise reject defendants' suggestion, raised for the first time at oral argument in this appeal, that if we agree to consider the legislative purpose behind the expanded definition of an "employee" under the Act, we should conclude that it provides employees falling within this expanded definition only with the right to assert claims premised on Medicaid or Medicare fraud. Although such claims may have been the primary concern of the bill's sponsor, there is absolutely nothing in the amendment's text reflecting such a limitation. Indeed, the types of prohibited

conduct for which those deemed "employees" under the Act may bring claims are set out elsewhere in the Act. See 740 ILCS 174/15, 20, 30 (West 2014). Legislative history may, where appropriate, aid us in construing a statutory provision, but our interpretation must still be firmly grounded in the text.

¶ 47    We do agree with defendants, however, that some ambiguity is required before we should consider this legislative history. Dr. Oommen assures us that "[e]ven where a statute is unambiguous, a [c]ourt can examine legislative history" like this "to better understand a legislative amendment." This is, in our view, contrary to well established principles of statutory construction. Our goal in construing a statute is always to ascertain and give effect to the legislature's intent, but the best indication of that intent will generally be the plain and ordinary meaning of the statute's language. *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 394-95 (2003). "Where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction" (*id.* at 395), including materials evidencing its legislative history (see *Nevitt v. Langfelder*, 157 Ill. 2d 116, 134 (1993) ("a basic rule of statutory construction forbids a court to canvass legislative history for evidence of legislative intent if the meaning of a provision can be determined from its text")).

¶ 48    As the only opinion of this court specifically addressing the issue, the circuit court in this case was bound to follow *Larsen*, 2015 IL App (4th) 140255. The *Larsen* court did not mention or apparently consider the legislative history behind the 2011 amendment to the Whistleblower Act's definition of "employee." Instead, with the aid of a legal dictionary, the court concluded that the plain meaning of the amendment was clear and Medicaid payments do not qualify as State "funding." *Id.* ¶ 62. The *Larson* court relied on the fact that "[t]he definition of 'fund' is '[t]o furnish money to (an individual, entity, or venture), [especially] to finance a particular project' "

*id*. ¶ 59 (quoting Black's Law Dictionary 697 (8th ed. 2004)), while " '[p]ayment is defined as the 'money or other valuable thing so delivered in satisfaction of an obligation.' " *Id.* (quoting Black's Law Dictionary 1165 (8th ed. 2004)). Armed with these definitions, the *Larsen* court reasoned that "the purpose of the Medicaid program is to defray the cost of providing medical care to the poor and needy by providing *payment* in satisfaction or partial satisfaction for the medical services provided." *Id.* ¶ 60. In the *Larsen* court's view, such payments are no different than the ones medical providers receive directly from patients or from health insurance companies on behalf of their beneficiaries. *Id.* The court then concluded that "[p]ayments such as these cannot reasonably be considered funding as contemplated by the Whistleblower Act." *Id.* What the Act instead contemplated, the court opined, was funding of the sort allocated "to financially support a particular program, experimental medical trial, or project offered by a health care facility," where "the funds allocated do not represent a direct exchange but, rather, finances provided to advance a project, program, or other laudable endeavor that the [S]tate has determined is in the public's best interest." *Id.* ¶ 61.

¶ 49    The *Larsen* court's premise, that transactional payments in exchange for services and State "funding" of programs in the public interest are mutually exclusive, ignores, in our view, the reality of the State's role. The State, in contrast to an ordinary consumer, such as a patient or a health insurance company, makes payments on such a vast and systemic scale that the line between funding and payments will often blur. It is appropriate, then, to consider the specifics of the Illinois Medicaid program to see if payments from that program in fact operate to fund, in whole or in part, the hospitals, nursing homes, clinics, and other medical facilities that participate in that program. As our supreme court has made clear:

"When discerning legislative intent, it is [ ] proper to compare statutes relating to the

same subject matter as well as statutes upon related subjects though not strictly *in pari materia* because statutes are to be read in the light of attendant conditions and the state of the law existent at the time of their enactment." (Internal quotation marks omitted.) *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 470 (2010).

¶ 50    In its *amicus* brief in this matter, ITLA persuasively argues that the Illinois Medicaid program exhibits the classic characteristics of State funding identified by the *Larsen* court. ITLA points out that Medicaid payments are not simple and direct exchanges of money for services, but are in fact influenced by a host of broader considerations, including the desire to compensate providers for their general administrative costs (89 Ill. Adm. Code 140.533 (eff. Nov. 6, 1988)), to reimburse them for the cost of their compliance with regulations instituting nursing home reforms (89 Ill. Adm. Code 140.540(a)(2) (eff. Nov. 6, 1988)), and to ensure each facility's profitability and ability to make a return on its investment (305 ILCS 5/5-5.5(b)(2) (West 2014)). The State indeed makes payments for services through the Medicaid program. It does so, however, not as a simple market actor, but for the broader purpose of support[ing] the medical safety net.

¶ 51    On this point, ITLA also directs our attention to the "Declaration of Purpose" found in the Illinois Public Aid Code, which states that the "[p]reservation of health, alleviation of sickness, and correction of disabling conditions for persons requiring maintenance support are essential if they are to have an opportunity to become self-supporting or to attain a greater capacity for self-care." 305 ILCS 5/5-1 (West 2014). This is especially important "[f]or persons who are medically indigent but otherwise able to provide themselves with a livelihood" because, for those individuals, the State has an interest in "maintain[ing] incentives for continued independence and preserv[ing] their limited resources for ordinary maintenance needs to prevent their total or substantial dependency." Based on these statements, ITLA argues that Medicaid payments are not mere

transactional exchanges but, in the *Larsen* court's words, are indeed "finances provided to advance a project, program, or other laudable endeavor that the [S]tate has determined is in the public's best interest." *Larsen*, 2015 IL App (4th) 140255, ¶ 61.

¶ 52 We agree. In the context of nursing homes and other medical facilities that are paid for their services in part by State-funded programs broadly established in the public interest, we find that the phrase "funded, in whole or in part, by the State" is, at the very least, subject to more than one reasonable interpretation. See *Krohe*, 204 Ill. 2d at 395-96 ("A statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more different ways."). Given this ambiguity, it is proper for us to consider the legislative history of the amendment, which, as we noted above, makes clear that, for purposes of the Act, Medicaid payments do indeed constitute State funding and doctors practicing at medical facilities receiving such payments are "employees" with standing to sue under the Act.

¶ 53                                    IV. CONCLUSION

¶ 54 For the above reasons, the circuit court's judgment in defendants' favor on Dr. Oommen's retaliatory discharge claims is affirmed, its judgment in their favor on his Whistleblower Act claims is reversed, and the case is remanded for further proceedings consistent with this opinion.

¶ 55 Affirmed in part and reversed in part.

¶ 56 Cause remanded.


¶ 57 JUSTICE GRIFFIN, specially concurring:

¶ 58 I concur with the well-reasoned and well-written opinion. I respectfully disagree with paragraph 43, however. The clause in question states as follows: "a licensed physician who practices his or her profession, in whole or in part, at a hospital, nursing home, clinic, or any

medical facility that is a health care facility funded, in whole or in part, by the State." Pub. Act 96-1253 (eff. Jan. 1, 2011) (amending 740 ILCS174/5). The use of the Oxford comma after "clinic" and applying the well-accepted last antecedent rule further broadens and supports our holding that the legislative intent was to consider physicians in Dr. Oommen's position "employees" for the purposes of the Whistleblower Act.

**No. 1-19-0854**

| | |
|---|---|
| **Cite as:** | *Oommen v. Glen Health and Home Management Inc.*, 2020 IL App (1st) 190854 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-L-4985; the Hon. Jerry A. Esrig, Judge, presiding. |
| **Attorneys for Appellant:** | Brian J. Spencer, of Spencer Law Offices, P.C., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kevin M. O'Hagan and Elizabeth M. Bartolucci, of O'Hagan Meyer LLC, of Chicago, for appellees. |