NO. 4-07-0404          Filed 12/28/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE MOST WORSHIPFUL GRAND LODGE OF | ) | Appeal from |
| ANCIENT FREE AND ACCEPTED MASONS OF | ) | Circuit Court of |
| THE STATE OF ILLINOIS, an Illinois | ) | Moultrie County |
| Corporation; and THE ILLINOIS MASONIC | ) | No. 06MR16 |
| HOME, an Illinois Not-for-Profit | ) | |
| Corporation, | ) | |
| Plaintiffs-Appellants, | ) | |
| v. | ) | |
| THE DEPARTMENT OF REVENUE OF THE | ) | |
| STATE OF ILLINOIS and BRIAN A. HAMER, | ) | |
| Director of Revenue of the State of | ) | Honorable |
| Illinois, | ) | Dan L. Flannell, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the opinion of the court:

In November 2003, plaintiffs, the Most Wonderful Grand Lodge of Ancient Free and Accepted Masons of the State of Illinois and the Illinois Masonic Home (collectively, the Lodge), filed an application for a nonhomestead property-tax exemption for 2003, pursuant to sections 15-65 and 15-125 of the Property Tax Code (35 ILCS 200/15-65, 15-125 (West 2002)). In January 2004, defendants, the Department of Revenue of the State of Illinois and Brian A. Hamer (collectively, the Department), denied the application. The Lodge later filed a petition under section 8-35 of the Code (35 ILCS 200/8-35 (West 2004)), requesting reconsideration of the application. Following a July 2006 hearing, the Department accepted the administrative law judge's (ALJ's) recommendation that the Lodge did not qualify for the specific tax exemption it sought. In December 2006, the Lodge

filed a complaint for administrative review, pursuant to section 8-40 of the Code (35 ILCS 200/8-40 (West 2006)), seeking reversal of the Department's determination. Following an April 2007 hearing, the circuit court affirmed the Department's decision.

The Lodge appeals, arguing that (1) the guidelines set forth in Methodist Old Peoples Home v. Korzen, 39 Ill. 2d 149, 233 N.E.2d 537 (1968), should be applied with regard to the evolving definition of "charitable use" and (2) the Department erroneously considered the property in isolation from the Lodge's integrated community and overarching charitable mission. We disagree and affirm.

I. BACKGROUND

A. The Lodge

Founded in 1904, the Lodge is an Illinois not-for-profit corporation that provides nursing-care services. In December 1917, the property owned by the Lodge was deemed tax exempt. See Most Worshipful Grand Lodge of Ancient Free & Accepted Masons of the State of Illinois v. Board of Review of Moultrie County, 281 Ill. 480, 485-86, 117 N.E. 1016, 1018 (1917) (concluding that the land owned by the Lodge fell within the statutory definition of lands actually and exclusively used for charitable or beneficent purposes).

Prior to 1997, the Lodge offered only two types of assistance and living programs--sheltered care and intermediate care. In 1997, the Lodge began to offer a third type of care, referred to as the "independent-living program." The Lodge

implemented this program based on survey results indicating that older residents desired to live where nursing care would be readily available.  In response, the Lodge developed apartment and duplex housing so that residents could "age in place" and easily transition within the Lodge's "continuum of care" as their physical and medical needs changed.  The Lodge's continuum of care consists of approximately 72 sheltered-care beds, 237 intermediate-care beds, and 48 independent-living units.  These different levels of assistance are located in separate buildings on the Lodge's property.

Prior to 1999, the Lodge's application procedures required prospective residents to surrender all assets in exchange for lifetime care.  In 1999, the Lodge altered the admissions procedures to include a fee-for-service program.  The procedures included an option to request financial-subsidy assistance through the Lodge's endowment-assistance program for residents in financial need.

Prospective independent-living residents must enter into a "life right contract" where they agree, in pertinent part, to (1) provide detailed information regarding their current health and financial status before entering into the contract; (2) provide, at their own expense, updated health and financial information as requested by the Lodge; (3) not deplete assets to the extent the applicant cannot meet the financial obligations of the contract; and (4) pay a $1,000 application fee.

Independent-living residents must also pay 25% of the

Lodge's initial unit fee upon occupancy or 60 days after signing the contract. The initial unit fee ranges from $18,000 to $117,000. In addition, residents are required to pay a monthly maintenance fee that ranges from $292 to $804. Both fees are contingent upon the type (apartment or duplex), size, and location of the unit. Residents in independent-living units may qualify for the endowment-assistance program if they exhaust their funds while living in the residence, but they still must pay the initial fee.

The Lodge's independent-living unit terms and conditions state, in pertinent part, that (1) the Lodge can terminate the agreement if a resident fails to pay monthly service fees and (2) if the resident cannot pay the independent-living unit fees, the Lodge has the right to reasonably accommodate the resident in another residential program where public or private assistance is available. When residents vacate their units, a portion of their initial fee is returned based upon their length of stay (ranging from an 80% to 95% refund for duplex residents and 55% to 90% refund for apartment residents).

B. Administrative Proceedings

In November 2003, the Lodge applied for a nonhomestead property-tax exemption for 2003, pursuant to sections 15-65(a), (c), and 15-125 of the Code (35 ILCS 200/15-65(a), (c), 15-125 (West 2002)). Prior to the Department's decision on the application, the Lodge and the Department stipulated that (1) the Lodge's request for a tax exemption applied only to the property

where the independent-living units were located and (2) the remainder of the Lodge's property continued to be tax exempt. In January 2004, the Department denied the application, upon finding that the property in question was neither owned nor used exclusively for charitable purposes. The Lodge later requested reconsideration under section 8-35 of the Code (35 ILCS 200/8-35 (West 2004)), and the matter proceeded to a hearing before an ALJ.

Following a June 2004 hearing, the ALJ recommended that the portion of the Lodge's property containing the independent-living units did not qualify for a tax exemption. Specifically, the ALJ made the following findings of fact: (1) before prospective residents can live in the independent-living units, they must pay a substantial fee that varies according to the size and desirability of the unit; (2) prospective residents must complete an application that demonstrates they have the financial and physical ability to reside in the units; (3) despite a provision in the Lodge's bylaws that it will waive fees in certain circumstances, initial fees for the independent-living program were not waived; (4) none of the residents in the independent-living units received assistance from the endowment-assistance program; (5) the Lodge does not have the legal obligation to keep residents in the units; and (6) the Lodge can remove residents for failure to pay fees. Based upon the guidelines announced by our supreme court in Methodist Old Peoples Home, 39 Ill. 2d at 156-57, 233 N.E.2d at 541-42, the ALJ determined that the primary use of the

independent-living program "appear[ed] to be to provide housing to residents who can pay for it."  In May 2005, the Department accepted the ALJ's recommendation.

In June 2005, the Lodge filed a petition under section 8-35 of the Code (35 ILCS 200/8-35 (West 2004)), seeking reconsideration.  The Lodge argued that the Department's decision (1) failed to adequately reflect evidence that the Lodge's charitable mission included providing a continuum of care, (2) incorrectly divided various elements of the Lodge's charitable program not intended to be operated in isolation from the remainder of the Lodge's programs, and (3) arbitrarily faulted the Lodge for not waiving initial fees prior to the original hearing.  In June 2005, the Department accepted the ALJ's order denying the Lodge's petition.

The Lodge later filed its first complaint for administrative review, pursuant to section 8-40 of the Code (35 ILCS 200/8-40 (West 2006)), seeking reversal of the Department's determination.  In February 2006, the circuit court remanded the matter to the Department with instructions to "conduct a rehearing and re-open [sic] proofs" to permit the Lodge to introduce additional financial evidence.

Following a June 2006 rehearing, the ALJ again recommended that the Lodge's application be denied.  The ALJ acknowledged that the Lodge "provided evidence that the independent[-]living units did not generate a profit" but reaffirmed that the facts "do not support a finding that the primary

- 6 -

use of the apartment and duplexes is charitable."  In November 2006, the Department accepted the ALJ's recommendation.

In December 2006, the Lodge filed another complaint for administrative review, pursuant to section 8-40 of the Code (35 ILCS 200/8-40 (West 2006)), arguing that the Department's decision was (1) contrary to law and (2) against the manifest weight of the evidence.  Following an April 2007 hearing, the circuit court denied the Lodge's complaint, upon finding that the Department's decision was not against the manifest weight of the evidence.

This appeal followed.

## II. ANALYSIS

### A. The Standard of Review

Prior to addressing the merits, we must determine the appropriate standard of review.  The Lodge contends that the appropriate standard of review is de novo.  The Department responds that this court's review is under the clearly erroneous standard.  We agree with the Department.

We first note that the appellate court's role is to review the administrative decision, not the circuit court's decision. Metro Developers, LLC v. City of Chicago Department of Revenue, 377 Ill. App. 3d 395, 397, 877 N.E.2d 785, 788 (2007). The appropriate standard of review concerning administrative decisions is contingent upon whether the question being reviewed is one of fact, law, or both.  Express Valet, Inc. v. City of Chicago, 373 Ill. App. 3d 838, 847, 869 N.E.2d 964, 972 (2007).

- 7 -

"An administrative agency's decision on questions of fact are entitled to deference and are reversed only if against the manifest weight of the evidence." Friends of Israel Defense Forces v. Department of Revenue, 315 Ill. App. 3d 298, 302, 733 N.E.2d 789, 792-93 (2000).  An administrative agency's decisions on questions of law are not afforded deference and thus are reviewed de novo. Friends of Israel Defense Forces, 315 Ill. App. 3d at 302, 733 N.E.2d at 793.  However, when a case "involves an examination of the legal effect of a given set of facts, it involves a mixed question of fact and law." City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998).  In such cases, we review the agency's decision under the clearly erroneous standard. City of Belvidere, 181 Ill. 2d at 205, 692 N.E.2d at 302; see Board of Trustees of the University of Illinois v. Illinois Labor Relations Board, 224 Ill. 2d 88, 97, 862 N.E.2d 944, 950 (2007) ("As we explained in City of Belvidere, the clearly erroneous standard of review is proper when reviewing a decision of [an administrative agency] because the decision represents a mixed question of fact and law").  Under this standard, the agency's decision will not be deemed clearly erroneous unless the reviewing court is left with the definite and firm conviction that a mistake has been committed. Daley v. Lakeview Billiard Café, Inc., 373 Ill. App. 3d 377, 381-82, 869 N.E.2d 171, 175 (2007).  "While this standard is highly deferential, it does not relegate judicial review to mere blind deference of an agency's order." Board of

<u>Trustees of the University of Illinois</u>, 224 Ill. 2d at 98, 862 N.E.2d at 951.

Because this case involves a mixed question of fact and law--namely, does the independent-living-program property qualify for a tax exemption--we review the Department's decision under the clearly erroneous standard.

### B. The Lodge's Claim That the Department Failed To Consider the Evolving Definition of "Charitable Use"

The Lodge first argues that the guidelines the Department used to determine whether property is tax exempt based upon charitable use as set forth in <u>Methodist Old Peoples Home</u>, 39 Ill. 2d at 156-57, 233 N.E.2d at 541-542, should have been applied with regard to the evolving definition of "charitable use."  We disagree.

"[T]he taxpayer seeking the protection of the exemption bears the burden of proving that he is entitled to it." <u>Harrisburg-Raleigh Airport Authority v. Department of Revenue</u>, 126 Ill. 2d 326, 331, 533 N.E.2d 1072, 1074 (1989).  "'[I]n determining whether property is included within the scope of the exemption, all facts are to be construed and all debatable questions resolved in favor of taxation.'"  <u>Eden Retirement Center, Inc. v. Department of Revenue</u>, 213 Ill. 2d 273, 289, 821 N.E.2d 240, 249 (2004), quoting <u>Methodist Old Peoples Home</u>, 39 Ill. 2d at 155, 233 N.E.2d at 540.

Section 15-65(a) of the Code provides, in pertinent part, as follows:

"All property of the following is exempt

when actually and exclusively used for chari-
table or beneficent purposes, and not leased
or otherwise used with a view to profit:

(a) Institutions of public
charity."  35 ILCS 200/15-65(a)
(West 2006).

"Two elements are required to entitle property to an exemption:
exclusive use for charitable purposes and ownership by a charita-
ble organization.  [Citations.]  The term 'exclusive use' refers
to the primary purpose for which the property is used, and not to
the secondary or incidental purpose."  Midwest Physician Group,
Ltd. v. Department of Revenue, 304 Ill. App. 3d 939, 953, 711
N.E.2d 381, 390 (1999).

In Methodist Old Peoples Home, our supreme court
outlined the following criteria in determining whether property
is exempt from taxation based upon charitable use: (1) the
benefits derived (a) are for an indefinite number of persons for
their general welfare or (b) in some way reduce the burdens on
government; (2) the organization has no capital, capital stock,
or shareholders and does not profit from the enterprise; (3)
funds are derived mainly from private and public charity, and the
funds are held in trust for the objects and purposes expressed in
the charter; (4) the charity is dispensed to all who need and
apply for it; (5) no obstacles appear to be placed in the way of
those seeking the benefits; and (6) the primary use of the
property is for charitable purposes.  Methodist Old Peoples Home,

39 Ill. 2d at 156-57, 233 N.E.2d at 541-42.

In addition, although the court stated that the mere charging of fees did not necessarily disqualify the property from a tax exemption, the following facts did not suggest a charitable use: (1) different fee schedules based upon size and desirability of the residence; (2) requiring applicants to be in good mental, emotional, and physical health and free of any communicable diseases; (3) rejecting prospective residents who were unable to pay the required fee; (4) evidence that the property's primary source of income was derived from fees rather than donations; and (5) discharging any legal obligation to house and maintain residents who were unable to fulfill their financial obligation or who otherwise became sick or unmanageable. Methodist Old Peoples Home, 39 Ill. 2d at 158-59, 233 N.E.2d at 542-43.

We note that in its brief to this court, the Lodge fails to mention or even challenge the specific findings that the Department made to substantiate the denial of the Lodge's application for a tax exemption. Rather, the Lodge asserts only that the Department, in applying the guidelines announced in Methodist Old Peoples Home, "failed to consider the larger picture, including the overwhelming charitable nature of the [Lodge]." However, in so asserting, the Lodge fell woefully short of fulfilling its burden to prove by clear and convincing evidence that the independent-living residences were actually and exclusively used for charitable or beneficent purposes, and not leased or otherwise used with a view to profit.

- 11 -

Moreover, our review of the record indicates that by its very terms, the life right contract affords the Lodge the ability to (1) charge residents a substantial fee, which varies depending on size and desirability of the residence; (2) require applicants to be in good mental, emotional, and physical health; (3) reject prospective residents who are unable to pay the required fee; and (4) discharge any legal obligation to residents who are unable to fulfill their financial obligation or who otherwise become unmanageable. In addition, the Lodge did not provide any evidence that any independent-living resident received financial assistance from the endowment-assistance program.

Given that all facts must be construed in favor of taxation, we agree with the Department that the evidence does not support a finding that the primary use of the apartments and duplexes under the independent-living program is charitable. The primary use of the residences appears to be to provide housing to residents who can afford to pay for it.

Therefore, because (1) the Lodge failed to carry its burden of proving by clear and convincing evidence that the exemption applied and (2) all facts are to be construed and all debatable questions resolved in favor of taxation, we conclude that the Department's decision that the Lodge's property used for the independent-living program did not qualify for a property-tax exemption was not clearly erroneous.

## C. The Lodge's Claim That the Department Erroneously Considered the Property-Tax Exemption in Isolation from Its Overarching Charitable Mission

The Lodge also argues that the Department, in deciding that the property used for the independent-living program did not qualify for a tax exemption, erroneously considered the property in isolation from the Lodge's integrated community and overarching charitable mission. We disagree.

"'[W]here property is used for two purposes, one of which is exempt from taxation and one of which is not, a tax should be assessed against that part which is devoted to a use not exempt from taxation.'" City of Chicago v. Illinois Department Of Revenue, 147 Ill. 2d 484, 499, 590 N.E.2d 478, 485 (1992), quoting City of Lawrenceville v. Maxwell, 6 Ill. 2d 42, 49, 126 N.E.2d 671, 676 (1955).

Because we have concluded that the Department's decision that the Lodge did not qualify for a property-tax exemption was not clearly erroneous, we reject the Lodge's assertion that the Department erroneously considered the property in isolation from the Lodge's integrated continuum of care. See Fairview Haven v. Department of Revenue, 153 Ill. App. 3d 763, 771, 506 N.E.2d 341, 347 (1987) (where this court concluded that 16 independent-living units connected to a dependent-care unit by a main hallway did not qualify for charitable-use exemption by virtue of fees charged to residents even though the dependent-care unit qualified for the exemption).

However, even if the independent-living units should

not have been viewed "in isolation" as the Lodge contends, the Lodge had the burden of showing that the independent-living units were merely incidental to the operation of the exempt portion of the Lodge.  See Streeterville Corp. v. Department of Revenue, 186 Ill. 2d 534, 536, 714 N.E.2d 497, 498 (1999) ("property may be wholly exempt from tax if any nonexempt use can be described as 'merely incidental' [citation]").

Thus, because (1) the Department's decision to reject the Lodge's petition for a property-tax exemption was not clearly erroneous and (2) the Lodge failed to carry its burden of proving by clear and convincing evidence that the exemption applied, we reject the Lodge's assertion that the Department erroneously considered the property in isolation from the Lodge's integrated community and overarching charitable mission.

In so concluding, we note that the Lodge urges this court to expand the dimensions of charitable use to include relief for the elderly regardless of pecuniary considerations. While the Lodge's argument is not unreasonable, it is directed to the wrong audience.  "The power to exempt from taxation is concomitant with the power to tax." Eden Retirement Center, 213 Ill. 2d at 285, 821 N.E.2d at 247.  "The legislature, having the inherent power to tax, also has the inherent power to grant exemptions from those taxes." Eden Retirement Center, 213 Ill. 2d at 285, 821 N.E.2d at 247.  Thus, although the Lodge urges this court to modify and expand the current status of the tax exemption, that role is exclusively within the province of the

legislature and not the courts.  See <u>Eden Retirement Center</u>, 213 Ill. 2d at 286, 821 N.E.2d at 248 (the court has no power to create exemptions from taxation by judicial construction).

### III. CONCLUSION

For the following reasons, we affirm the circuit court's judgment.

Affirmed.

KNECHT and COOK, JJ., concur.