2025 IL App (1st) 230913

No. 1-23-0913

Filed April 30, 2025

THIRD DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEPSICO, INC., and AFFILIATES, | ) | Petition for Direct |
| | ) | Administrative Review of an |
| Petitioner, | ) | Order of the Illinois Independent |
| | ) | Tax Tribunal. |
| v. | ) | |
| | ) | Nos.   16 TT 82 |
| THE DEPARTMENT OF REVENUE | ) | 17 TT 16 |
| and THE ILLINOIS INDEPENDENT TAX | ) | |
| TRIBUNAL, | ) | Honorable |
| | ) | James M. Conway, |
| Respondents. | ) | Judge Presiding. |

JUSTICE MARTIN delivered the judgment of the court, with opinion.
Justices Reyes and D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    In this administrative review action, the petitioner, PepsiCo, Inc., and its worldwide

affiliates and subsidiaries (collectively, PepsiCo), appeal from an order of the Illinois Independent

Tax Tribunal (Tribunal), affirming the decision of the Illinois Department of Revenue

(Department). The Department audited PepsiCo and determined that for tax years 2011 through

2013, the income of a PepsiCo subsidiary, Frito-Lay North America, Inc. (FLNA), was improperly

excluded from PepsiCo's "unitary business group" as defined in section 1501(a)(27) of the Illinois

Income Tax Act (Tax Act) (35 ILCS 5/1501(a)(27) (West 2010)).[1] As a result, FLNA's income was added to PepsiCo's unitary business group's income, and the Department calculated taxes and interest, issued notices of deficiency, and assessed late penalties.

¶ 2    PepsiCo appealed to the Tribunal, and it found in favor of the Department. For the reasons that follow, we affirm the Tribunal's decision.[2]

¶ 3                                    I. BACKGROUND

¶ 4    PepsiCo is a multinational food and beverage corporation headquartered in Purchase, New York. Like many other multinational corporations, PepsiCo operates through a network of subsidiaries.

¶ 5    In 2010, PepsiCo underwent a global restructuring of its operations. Part of the restructuring entailed PepsiCo reorganizing and consolidating its subsidiary FLNA. FLNA is headquartered in Texas and is PepsiCo's core domestic snack food line. Under the consolidation, FLNA continued to employ senior domestic marketing employees and general management, however, many of its employees were transferred to other subsidiaries.

¶ 6    Some of these employees were highly skilled candidates that PepsiCo recruited to work internationally at its various subsidiaries through an "Expatriate Program." The program includes individuals who are high-performing executives, managers, and analysts whom PepsiCo refers to as expatriates. They are assigned to work at various foreign locations including, but not limited to,

---

[1]The Tax Act defines a "unitary business group" as "a group of persons related through common ownership whose business activities are integrated with, dependent upon and contribute to each other." 35 ILCS 5/1501(a)(27) (West 2010); see 86 Ill. Adm. Code 100.9700(g), amended at 32 Ill. Reg. 10,170 (eff. June 30, 2008). The business activity of a corporation is measured by factors such as payroll, tangible property, and sales. 86 Ill. Adm. Code 100.9700(c)(1), amended at 32 Ill. Reg. 10,170 (eff. June 30, 2008).

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon entry of a separate written order.

China, Japan, Mexico, Poland, Russia, Spain, Switzerland, Thailand, the United Arab Emirates, and the United Kingdom. The program is overseen by personnel in the PepsiCo Corporate Group (PCG) human resources department.

¶ 7    As part of the global restructuring, PepsiCo's tax department created PepsiCo Global Mobility, LLC (PGM), which was incorporated under Delaware state law and treated as a disregarded entity for federal income tax purposes. See 26 C.F.R. §§ 301.7701-2, 301.7701-3 (2010). [3] PGM was designated as a division of FLNA and ostensibly served as a global employment company or "GEC" for the expatriates.

¶ 8    Prior to the formation of PGM, PCG utilized three separate expatriate program entities: Beverages Foods & Services Inc., C&I Leasing, Inc., and Pepsi-Cola General Bottlers, Inc. After PGM's formation, PCG utilized PGM as the single expatriate program entity.

¶ 9    For each foreign assignment, PGM would execute a secondment agreement with the foreign host company and a letter of understanding with the expatriate. [4] The secondment agreements required the expatriates to provide the foreign host company with specific technical services. The letters of understanding set forth the terms of the expatriates' employment. Personnel from PCG human resources signed the agreements on behalf of PGM. Most expatriate assignments lasted three to five years.

¶ 10    After the restructuring, PepsiCo transferred all United States expatriates assigned to work at foreign host companies onto PGM's payroll reports for accounting purposes. The majority of

---

[3]A disregarded entity is a business entity that is separate and apart from its owner for tax purposes; the disregarded entity's transactions are disregarded for federal tax purposes.

[4]"A secondment agreement is a contractual agreement between a worker's home country employer and the host country employer. As a general rule, the secondment agreement provides that the worker will remain 'employed' by [their] home country employer and will be loaned or seconded to the foreign affiliate for a period of time." Helen H. Morrison, *The Affordable Care Act—Implications for Multinational Employers and Expatriate Employees*, 30 J. Comp. & Benefits No. 2, Mar./Apr. 2014 at art. 2.

FLNA's payroll was attributed to PGM. PepsiCo's tax department estimated that by creating PGM as a division of FLNA and treating the expatriates as employees of PGM, PepsiCo would recognize $14 million per year in state income tax savings in 13 states. PepsiCo reasoned that by treating the expatriates as employees of PGM and treating their compensation as foreign payroll of FLNA, FLNA would meet the 80% payroll threshold required to qualify it as an 80/20 company on PepsiCo's State of Illinois income tax returns.[5]

¶ 11    PepsiCo excluded FLNA's income from its unitary business group's income for tax years 2011 through 2013.[6] As a result, FLNA's approximately $2.5 billion in annual profits from domestic sales of snack foods was excluded from PepsiCo's unitary business group's income for purposes of calculating its State of Illinois income taxes. This resulted in PepsiCo reducing its Illinois State tax liability to zero for the three tax years at issue. In addition, the exclusion generated net operating losses of approximately $19.5 million, $48.5 million, and $35 million for those three years.

¶ 12    The Department conducted an audit of PepsiCo's tax returns and determined that PepsiCo improperly excluded FLNA's income on the unitary business group's combined income tax returns from 2011 through 2013. The Department found, in part:

"The most noticeable change during the audit period *** is that a large portion of PepsiCo's foreign payroll was shifted onto FLNA's books in what appears to be an effort by the taxpayer to meet the 80/20 requirement. The auditor concluded that if FLNA's payroll

---

[5]As detailed later in the order, an 80/20 company is "a U.S. corporation that receives 80% or more of its gross income for the testing period from an active foreign business." *International Tax Reform Proposals: Treasury's Green Book*, 20 J. Int'l Tax'n 6, at *1 (Aug. 2009); see Darice M. Henritze, Income Taxation of Natural Resources § 23.324 (Sept. 2022 Update) ("An '80/20' company is a domestic corporation that generates at least 80 percent of its gross income from active conduct of a foreign trade or business").

[6]During prior tax years, PepsiCo included FLNA's income in its unitary business group.

during the audit period was properly segment [*sic*] by business unit based on which business units benefit from the services provided by the foreign expatriate employees, FLNA would fail the 80/20 test."

¶ 13    The Department's findings resulted in FLNA's income of approximately $2.5 billion per year being added to PepsiCo's unitary business group's income for purposes of calculating its State of Illinois income taxes for tax years 2011 through 2013. The Department calculated taxes and interest, issued notices of deficiency, and assessed late payment penalties of approximately $2.1 million for those three years.

¶ 14    PepsiCo filed two petitions with the Tribunal appealing the Department's findings, No. 16-TT-82 and No. 17-TT-16, which were subsequently consolidated. PepsiCo and the Department submitted joint stipulations of fact and exhibits.[7]

¶ 15    PepsiCo filed a motion for summary judgment, asserting that the expatriate employees who were assigned to work at foreign affiliates through letters of understanding and secondment agreements should be considered employees of FLNA through PGM. PepsiCo further argued that the payroll factor used to determine whether FLNA qualified as an 80/20 company should include payroll costs reported by PGM as compensation paid to expatriate employees.

¶ 16    The Department filed a reply brief opposing PepsiCo's motion for summary judgment and asked the Tribunal to uphold the notices of deficiency and enter judgment in its favor. The Department argued that under the economic realities test, the compensation paid to the expatriate employees and charged to PGM could not be considered foreign payroll of FLNA, as PGM was not the employer of the expatriates since it lacked the right to control their work. The Department

---

[7]Factual stipulations are required by the Tribunal's rules. 86 Ill. Adm. Code 5000.340(a) (2014) ("The parties are required to stipulate, to the fullest extent to which complete or qualified agreement can or fairly should be reached, all undisputed facts not privileged that are relevant to the pending controversy.").

noted that the expatriates provided their services exclusively to foreign host companies who managed, controlled, and evaluated their work. According to the Department, PGM had no economic substance and was only a "legal shell to which expatriate compensation is charged and Foreign Host Company reimbursement of this expense is credited." PGM was "treated as the expatriates' employer for payroll tax and other compensation reporting purposes."

¶ 17    The Tribunal found in favor of the Department. It analyzed the matter applying the doctrine of economic substance. This common-law doctrine "permits a court to disregard, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality." *Agilent Technologies, Inc. v. Department of Revenue*, 2017 COA 137, ¶ 39. "A lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance." *Id.* Under the related doctrine of substance over form, reviewing courts " 'look to the objective economic realities of a transaction rather than to the particular form the parties employed' in deciding how to treat a particular transaction for tax purposes." *Shockley v. Commissioner of Internal Revenue*, 872 F.3d 1235, 1247 (11th Cir. 2017) (quoting *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978)).

¶ 18    Here, the Tribunal determined that PepsiCo's primary motive in creating PGM was to reduce PepsiCo's overall tax liability and that PGM had no economic substance apart from the tax benefits it conferred. The Tribunal applied the substance over form doctrine and determined that the compensation paid to the expatriate employees and charged to PGM could not be considered foreign payroll of FLNA because PGM was merely a shell corporation "used to list expatriates as employees," and had no economic substance. It noted that PGM "had no assets, no capitalization, no management or supervisory employees, and no offices." PGM "conducted no business operations that generated or potentially generated any profit." The Tribunal stated in part:

"PGM LLC ostensibly became the employer of the expatriates on paper for purposes [*sic*] payroll and benefits, but again, all that really occurred was a name change to list PGM LLC as the employer on W-2's and the like. Payroll and related human resource benefits for the expatriates were made to appear to be paid by PGM LLC when, in reality, those amounts were paid by the foreign host companies with PepsiCo making internal journal entries to record those reimbursements so the payments could ostensibly be the payroll and benefits amount paid by and attributed to PGM LLC."

¶ 19    The Tribunal further held that PepsiCo failed to meet its burden of demonstrating that PGM was the true employer of the expatriates. It rejected PepsiCo's contention that the letters of understanding and secondment agreements were controlling as to whether the expatriates were employees of PGM. The Tribunal determined that although PGM had secondment agreements with the expatriates, the terms of the agreements could not be enforced because PGM had no management or supervisory employees with the ability to control the expatriates' work or terminate their employment. "[T]he day-to-day supervision of the expatriates was ceded to the foreign host companies."

¶ 20    The Tribunal concluded that PGM must be disregarded as it has no economic substance and, thus, could not be considered the employer of the expatriates. "As a consequence, FLNA [could not] be considered an 80/20 company and *** must be included in the PepsiCo Illinois unitary group." The Tribunal denied PepsiCo's motion for summary judgment and upheld the Department's notices of deficiency as they pertained "to the 80/20 issue."[8]

---

[8]The following law review article, treatise, and newsletter summarize the Tribunal's decision. See Shayak Sarkar, *Capital Migration*, 57 U.C. Davis L. Rev. 2077, 2101 (2024); Jerome R. Hellerstein & Walter Hellerstein, State Taxation § 8.18 (3d ed. 2024), 2012 WL 3347755; *Business Group Member Was Not Excluded 80/20 Company in Illinois*, RIA State & Local Tax Update (Apr. 20, 2021), 2021 WL 1545679.

¶ 21    PepsiCo filed a motion for correction, asserting that there was no legal basis for ruling in favor of the Department in the absence of a cross-motion for summary judgment. The Tribunal issued a revised decision rejecting PepsiCo's "lack of legal basis" argument but included a footnote in the decision explaining it had treated the Department's reply brief as a cross-motion for summary judgment.

¶ 22    The parties then submitted cross-motions for summary judgment on the late penalty issue. The Tribunal upheld the Department's finding that PepsiCo failed to show reasonable cause to abate the charged penalties. The Tribunal's decision became final on April 28, 2023, when the parties' remaining issues were resolved.

¶ 23    On May 19, 2023, PepsiCo filed a timely petition for direct administrative review with this court.

¶ 24                               II. ANALYSIS

¶ 25                          A. Administrative Review Law

¶ 26    Our review is governed by the Administrative Review Law. See 735 ILCS 5/3-101 *et seq.* (West 2022). On appeal from an administrative review proceeding, this court reviews the decision of the administrative agency—here, the Department. *JM Aviation, Inc. v. Department of Revenue*, 341 Ill. App. 3d 1, 9 (2003).

¶ 27                1. Reply Brief as Cross-Motion for Summary Judgment

¶ 28    As an initial matter, PepsiCo argues that the Tribunal erred by treating the Department's reply brief as a cross-motion for summary judgment. We disagree.

¶ 29    The record demonstrates that both parties, as well as the Tribunal, understood that the parties would be filing cross-motions for summary judgment and implemented a briefing schedule to allow the motions to be briefed and considered. The Tribunal's scheduling orders referenced

"summary judgment motions," and the parties' respective counsel exchanged e-mails discussing those motions. Therefore, based on the parties' submissions and arguments made therein, we find that the Tribunal properly treated the Department's reply brief as a cross-motion for summary judgment. See *Casteel v. Jiminez*, 2022 IL App (1st) 201288, ¶ 20 ("The content of a pleading governs over its label.").

¶ 30    PepsiCo maintains that even if the Department's reply brief could properly be treated as a cross-motion for summary judgment, the Tribunal failed to apply the correct legal standard in evaluating the motion. PepsiCo claims that once the Tribunal decided to treat the Department's reply brief as a cross-motion for summary judgment, it was required to consider each motion separately, viewing the evidence and inferences therefrom in the light most favorable to the non-moving party. PepsiCo argues that the Tribunal applied the wrong legal standard by construing "contested facts" against it. Again, we must disagree.

¶ 31    "When parties file cross-motions for summary judgment, they mutually agree that there are no genuine issues of material fact and that only a question of law is involved." *Rushton v. Department of Corrections*, 2019 IL 124552, ¶ 13.

¶ 32    In this case, the parties agreed that the facts were clear and undisputed. In the proceedings below, PepsiCo noted that "[t]he parties executed Joint Stipulations of Fact consisting of 158 stipulations, 47 exhibits, and thousands of pages of authenticated business records and evidential documents." It maintained that "[t]he facts [were] clear and undisputed" and that the "law [was] equally clear." PepsiCo acknowledged that the issue before the Tribunal was the "[a]pplication of the controlling statutory and regulatory framework to the Joint Stipulations." Hence, there were no contested facts to be construed in favor of or against either party since the facts were uncontested and stipulated to by the parties. The Tribunal did not apply an incorrect legal standard

in ruling on the parties' cross-motions for summary judgment.

¶ 33                                              2. Standard of Review

¶ 34    There is also disagreement between the parties as to the standard of review this court should employ. The applicable standard of review concerning an administrative agency's final decision "depends upon whether the question presented is one of fact, one of law, or a mixed question of law and fact." *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001).

¶ 35    "The factual determinations of an administrative agency are deemed *prima facie* true and correct." *Hartmarx Corp. & Subsidiaries v. Bower*, 309 Ill. App. 3d 959, 963 (1999). "An administrative agency's decisions on questions of fact are entitled to deference and are reversed only if against the manifest weight of the evidence." *Hormel Foods Corp. v. Zehnder*, 316 Ill. App. 3d 1200, 1204 (2000).

¶ 36    "An administrative agency's decisions on questions of law are not afforded deference and thus are reviewed *de novo*." *Most Worshipful Grand Lodge of Ancient Free & Accepted Masons of Illinois v. Department of Revenue*, 378 Ill. App. 3d 1069, 1074 (2007).

¶ 37    "Mixed questions of fact and law, which involve the application of law to a particular set of facts, are subject to review under the clearly erroneous standard ***." *Zebra Technologies Corp. v. Topinka*, 344 Ill. App. 3d 474, 480-81 (2003). This standard of review lies somewhere between manifest weight of the evidence and *de novo*, allowing deference to an agency's experience and expertise. *Hormel Foods Corp.*, 316 Ill. App. 3d at 1205 (citing *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998)). Under the clearly erroneous standard of review, an agency's decision will be reversed only where "the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger*

*Service*, 198 Ill. 2d at 395 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 38     PepsiCo contends that the instant case involves the interpretation of section 1501(a)(27) of the Tax Act, which it claims presents a question of statutory construction that we should review *de novo*. The Department counters that the appropriate standard of review is clearly erroneous, as the issue is whether the Department correctly applied relevant sections of the Tax Act to the undisputed facts set forth in the parties' joint stipulations of fact. We agree with the Department.

¶ 39     As previously noted, the parties agreed that the facts were clear and undisputed. They agreed that the issue was the "[a]pplication of the controlling statutory and regulatory framework to the Joint Stipulations." Consequently, this case involves an examination of the legal effect of a given set of facts, which involves a mixed question of fact and law that is reviewed under the clearly erroneous standard. *City of Belvidere*, 181 Ill. 2d at 205; see *Jurcev v. Central Community Hospital*, 7 F.3d 618, 623 (7th Cir. 1993) (Seventh Circuit Court of Appeals applied clearly erroneous standard in reviewing federal district court's grant of summary judgment where the facts were undisputed, the district court applied the law to those facts, and the nonmoving party made no request for a jury trial). We now turn to the merits of the case.

¶ 40                                B. The Merits

¶ 41     As a framework for our discussion, we begin with a brief overview of the legal principles guiding our analysis.

¶ 42     "[T]he amount of income fairly attributable to activities within the taxing State must be discerned before income tax constitutionally may be imposed." *General Telephone Co. of Illinois v. Johnson*, 103 Ill. 2d 363, 368-69 (1984); *Borden, Inc. v. Department of Revenue*, 295 Ill. App. 3d 1001, 1004 (1998) (citing *General Telephone*, 103 Ill. 2d at 368, for the same proposition). A

state's ability to tax business income earned outside of its borders is limited by the due process and commerce clauses of the United States Constitution (U.S. Const., amends. V, XIV; U.S. Const. art. 1, § 8). See *Container Corp. of America v. Franchise Tax Board*, 463 U.S. 159, 165-66 (1983). These federal clauses prohibit a state from taxing income arising out of a business's interstate activities "unless there is a 'minimal connection' or 'nexus' between the interstate activities and the taxing [s]tate, and 'a rational relationship between the income attributed to the [s]tate and the intrastate values of the enterprise.' " (Internal quotation marks omitted.) *Id.* at 165-66 (quoting *Exxon Corp. v. Department of Revenue of Wisconsin*, 447 U.S. 207, 219-20 (1980)). The requisite minimal connection is established if the intrastate and interstate activities "formed part of a single unitary business." *Mobil Oil Corp. v. Commissioner of Taxes of Vermont*, 445 U.S. 425, 438 (1980).

¶ 43    Illinois requires corporate taxpayers who are members of the same unitary business group to file a combined tax return, as though the members were a single taxpayer. 35 ILCS 5/502(e) (West 2010); *AT&T Teleholdings, Inc. v. Department of Revenue*, 2012 IL App (1st) 110493, ¶ 15. If a member of a unitary business group conducts part of its business activities in Illinois, section 304(e) of the Tax Act requires that business income attributable to Illinois by that member must be apportioned using the combined apportionment method. 35 ILCS 5/304(e) (West 2010); *AT&T Teleholdings*, 2012 IL App (1st) 110493, ¶ 15; *Bower*, 309 Ill. App. 3d at 967. Under the combined apportionment method, each member computes its taxable income attributable to activities within Illinois based on apportionment factors such as property, payroll, and sales. *General Telephone*, 103 Ill. 2d at 371.

¶ 44    The Tax Act also provides, however, that a corporation's income may be excluded from its combined Illinois income tax returns if 80% or more of its property and payroll is located and

generated outside of the United States. Section 1501(a)(27) of the Tax Act provides, in relevant part, that a unitary business group "will not include those members whose business activity outside the United States is 80% or more of any such member's total business activity." 35 ILCS 5/1501(a)(27) (West 2010). This is the so-called "80/20" rule. See *Zebra*, 344 Ill. App. 3d at 481-82 (discussing and applying the rule).

¶ 45 The dispute here centers on whether FLNA was properly excluded from PepsiCo's unitary business group under the 80/20 rule. The answer turns on whether PepsiCo properly classified the expatriates as employees of PGM. If it did not, then the expatriates cannot be considered employees of FLNA through PGM, and consequently, the compensation paid to the expatriates cannot be counted as foreign payroll of FLNA. Without this foreign payroll, FLNA fails to qualify as an 80/20 company.

¶ 46                                    1. Expatriate Employees

¶ 47 The issue of whether an employer-employee relationship exists is generally a question of fact to be determined based on the particular circumstances of each case. *Conrads v. Rush-Copley Medical Center, Inc.*, 2023 IL App (2d) 220455, ¶¶ 39-40; 26 C.F.R. § 31.3401(c)-1(d) (2010). However, when as here, there is no conflict of evidence and just one conclusion can be reasonably drawn, the question is one of law. *Conrads*, 2023 IL App (2d) 220455, ¶ 39.

¶ 48 "To determine the existence of an employer-employee relationship we must look to common law concepts." *Professional & Executive Leasing, Inc. v. Commissioner of Internal Revenue*, 89 T.C. 225, 231 (1987). " '[T]here is no rigid rule of law governing the determination of whether an employer-employee relationship exists.' " *Oommen v. Glen Health & Home Management Inc.*, 2020 IL App (1st) 190854, ¶ 28 (quoting *Netzel v. Industrial Comm'n*, 286 Ill. App. 3d 550, 553 (1997)). However, courts have found that the most important factor in

determining whether an employer-employee relationship exists is whether the purported employer has the right to control the manner of an individual's work, not only as to the result, but also as to the means and methods to be used for accomplishing that result. *Conrads*, 2023 IL App (2d) 220455, ¶ 40; 26 C.F.R. § 31.3401(c)-1(b) (2010). Courts also consider (1) the method of payment; (2) who furnishes the tools, materials, equipment, and location of the work; and (3) the right to discharge. *Conrads*, 2023 IL App (2d) 220455, ¶ 40; 26 C.F.R. § 31.3401(c)-1(b) (2010). "While the cases which deal with the common law factors usually involve a determination of whether a person is an employee or an independent contractor, the principles are equally applicable to determine by whom an individual is employed." *Professional & Executive Leasing*, 89 T.C. at 232.

¶ 49     Considering these factors in the instant case, the evidence demonstrates that PGM was not the expatriates' employer. In the parties' joint stipulation of facts, PepsiCo acknowledged that the foreign host companies had "the right to direct, control, and supervise the day-to-day services performed" by the expatriates and that PGM did not exercise such control or supervision. The "expatriates perform[ed] services for the host companies under the direction of and for the benefit of the host companies." A foreign host company manager assesses an expatriate's day-to-day performance and prepares an annual performance rating, which is then submitted to the PCG's executive compensation team for final compensation determinations.

¶ 50     The foreign host companies shoulder the costs of the expatriates' salaries and benefits, which includes bonuses and deferred and executive benefits (*e.g.*, stock options). In addition, they are responsible for procuring and maintaining insurance coverage on behalf of the expatriates. The foreign host companies also provide the locations and facilities where the expatriates work. And the foreign host companies have the right to discharge expatriates from their work assignments.

Viewing these factors as a whole, it is clear that PGM was not the employer of the expatriates.

¶ 51    PepsiCo's arguments to the contrary do not warrant a different conclusion. PepsiCo argues that although it conceded the right to control and supervise the expatriates' day-to-day activities to the foreign host companies, PGM retained the overall right to control the expatriates for the entire assignment. This argument is unpersuasive. Under common law and section 31.3401(c)-1(b) of the Treasury regulations on employment tax (26 C.F.R. § 31.3401(c)-1(b) (2010)), an employment relationship exists if the employee is subject to the will and control of the employer— not only as to what shall be done, but how it shall be done. Here, since PepsiCo conceded the right to control and supervise the expatriates' day-to-day activities to the foreign host companies, it follows that PGM did not control or have the right to control how the expatriates performed their work.

¶ 52    PepsiCo next argues that the right-to-control factor was satisfied by the contractual agreements between the parties—specifically the letters of understanding that PGM executed with each of the expatriates and the secondment agreements PGM executed with the foreign host companies.

¶ 53    PepsiCo contends that the letters of understanding set forth the employment terms for the expatriates and required them to, among other things, "do all things established by PGM LLC to complete the assignments and to adhere to all PGM LLC policies and to the laws and regulations of any country in which the seconded expatriate is assigned." PepsiCo claims that in conjunction with the letters of understanding, the secondment agreements required the expatriates to provide the foreign host company with specific technical services. According to PepsiCo, these contractual relationships had real life implications for the expatriates and were imbued with economic substance and effect, a fact that the Tribunal either ignored or disregarded.

¶ 54    "A contract which purports to create an employer-employee relationship is not controlling where an analysis of the common law factors as applied to the facts of the particular situation establish that such a relationship does not exist." *United States v. Garami*, 184 B.R. 834, 838 (Bankr. M.D. Fla. 1995); *Professional & Executive Leasing*, 89 T.C. at 233 (same). The particular facts in this case demonstrate that the language contained in the letters of understanding and secondment agreements did not give rise to an employer-employee relationship between PGM and the expatriates. PGM had no authority or ability to ensure that the expatriates complied with the terms contained in those documents, since it employed no managerial or supervisory personnel of its own. PepsiCo acknowledged that it conceded the right to control and supervise the expatriates' day-to-day activities to the foreign host companies. Moreover, none of the PepsiCo human resources personnel who signed the secondment agreements on behalf of PGM had the authority to manage or supervise the expatriates.

¶ 55    PepsiCo next argues that PGM controlled the expatriates by controlling the compensation they earned during their work assignments with the foreign host companies. In support of this argument, PepsiCo points to the following: (1) cash payments to expatriates originate in PGM's books and records as payroll expenses; (2) withheld income taxes and United States payroll and employment taxes are remitted in PGM's name on payments to the expatriates; and (3) when required under United States law, form W-2s, and wage and tax statements are submitted in PGM's name. None of these considerations support PepsiCo's position. The facts demonstrate that PGM did not exercise any control over the expatriates' compensation.

¶ 56    The parties stipulated that the expatriates "perform services for the host companies under the direction of and for the benefit of the host companies." PGM "is reimbursed for 100% of all payments and benefits paid to the seconded expatriates." PGM's "books are credited for foreign

16

host companies' reimbursement of seconded expatriate payments and benefits" Accordingly, these stipulated facts show that the foreign host companies bore the costs of the expatriates' services. Moreover, the foreign host companies prepared the expatriates' annual performance reviews and sent them to PepsiCo's Corporate compensation team, not PGM, for final compensation determinations.

¶ 57     PGM exercised no control over the expatriates' compensation, it merely functioned as a conduit through which the compensation and reimbursement flowed. And although PGM's name appeared on the expatriates' paychecks and W-2s, PGM did not decide their salaries, since those decisions were made by PCG's compensation team. PepsiCo's third-party payroll contractor, Hewitt, withheld payroll and employment taxes for the expatriates, not PGM or the third-party payroll service used by PGM.

¶ 58     Next, PepsiCo points out that PGM exercised minimal control over the expatriates compared to its nonprofessional employees, as the expatriates were high-performing executives, directors, managers, and analysts. Nevertheless, as detailed above, the control and supervision of the expatriates' day-to-day activities was provided by the foreign host companies, and moreover, this fact was not changed by the temporary nature of the assignments.

¶ 59     PepsiCo finally contends that the Tribunal erred in concluding that PGM "was simply a shell corporation with no economic reality." PepsiCo argues that PGM functioned as a *bona fide* company that created real economic effect for PCG through the expatriate program, which PepsiCo claims helped it expand business operations into emerging foreign markets.

¶ 60     The stipulated facts demonstrate that the expatriate program was operated by PCG executives and human resources personnel, not PGM. The parties stipulated to the following:

"PepsiCo Corporate Group management identifies and approves individuals for

17

assignment to foreign host companies pursuant to its determination of the skill set and interest of each individual, and the business needs of the foreign host companies."

¶ 61    Based on the above, we believe that any corporate benefits resulting from the expatriate program are attributable to the program itself and not PGM. It is corporate management, not PGM, who identifies and approves individuals to work for foreign host companies; and it is the foreign host companies, not PGM, who supervises the expatriates' daily work activities as they gain knowledge about operating in foreign markets.

¶ 62    In sum, PepsiCo improperly classified the expatriates as employees of PGM, and therefore, the expatriates cannot be considered employees of FLNA through PGM. Consequently, the compensation paid to the expatriates cannot be counted as foreign payroll of FLNA to meet the 80% payroll threshold.

¶ 63                                          2. Abatement

¶ 64    We begin this section of our analysis by noting that "a taxpayer has the legal right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by any means which the law permits." *Bridges v. Commissioner of Internal Revenue*, 325 F.2d 180, 183 (4th Cir. 1963). "A taxpayer may not, however, claim tax benefits that Congress did not intend to confer by setting up a sham transaction lacking any legitimate business purpose, or by affixing labels to its transactions that do not accurately reflect their true nature." *BB&T Corp. v. United States*, 523 F.3d 461, 471 (4th Cir. 2008). "Accordingly, under the 'economic substance doctrine,' a transaction may be disregarded as a sham for tax purposes if the taxpayer 'was motivated by no business purposes other than obtaining tax benefits ***.' " *Id.* (quoting *Rice's Toyota World, Inc. v. Commissioner of Internal Revenue*, 752 F.2d 89, 91 (4th Cir. 1985)).

¶ 65    With these considerations in mind, we now turn to PepsiCo's abatement arguments.

PepsiCo contends that the Tribunal erroneously upheld the late payment penalties assessed against it by the Department.

¶ 66    Section 3-8 of the Uniform Penalty and Interest Act provides that penalties for failing to file a return or pay taxes at the required time will not apply if the failure was due to "reasonable cause." 35 ILCS 735/3-8 (West 2010). In this regard, the most important factor is "the extent to which the taxpayer made a good faith effort to determine his proper tax liability and to file and pay his proper liability in a timely fashion." 86 Ill. Adm. Code 700.400(b), amended at 25 Ill. Reg. 5038 (eff. Mar. 19, 2001). "A taxpayer will be considered to have made a good faith effort to determine and file and pay his proper tax liability if he exercised ordinary business care and prudence in doing so." 86 Ill. Adm. Code 700.400(c), amended at 25 Ill. Reg. 5038 (eff. Mar. 19, 2001). "A determination of whether a taxpayer exercised ordinary business care and prudence is dependent upon the clarity of the law or its interpretation and the taxpayer's experience, knowledge, and education." *Id.*

¶ 67    "The existence of reasonable cause justifying abatement of a tax penalty is a factual determination that is to be decided on a case-by-case basis." *Horsehead Corp. v. Department of Revenue*, 2019 IL 124155, ¶ 46; see 86 Ill. Adm. Code 700.400(b), amended at 25 Ill. Reg. 5,038 (eff. Mar. 19, 2001). That determination will not be reversed unless it is against the manifest weight of the evidence. *Horsehead Corp.*, 2019 IL 124155, ¶ 46. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 68    PepsiCo argues that the penalties should be abated, as the evidence reveals that it acted in good faith and exercised reasonable care when it classified FLNA as an 80/20 company. PepsiCo

19

points to evidence demonstrating its strong history of federal, state, and international tax compliance.

¶ 69    "The Department will *** consider a taxpayer's filing history in determining whether the taxpayer acted in good faith in determining and paying his tax liability." 86 Ill. Adm. Code 700.400(d), amended at 25 Ill. Reg. 5,038 (eff. Mar. 19, 2001). Here, the Tribunal found that "the tax years reported in the stipulation reflect an overall good compliance history for PepsiCo in filing and paying its State of Illinois tax liabilities prior to the creation of PGM." The Tribunal added, however, that a taxpayer's compliance history is just one factor to consider, and that the primary factor is whether the taxpayer made a good faith effort to determine and pay the proper tax liability by exercising ordinary business care and prudence in doing so.

¶ 70    PepsiCo also relies on a certification from Charles Mueller to demonstrate that it exercised ordinary business care in creating PGM. Mueller, who served as PepsiCo's vice president of state and local tax, was a member of PepsiCo's tax department during the time PGM was created. He was responsible for the decision to classify FLNA as an 80/20 company on the Illinois state tax returns for tax years at issue.

¶ 71    "One common method of demonstrating reasonable cause is to show reliance on the advice of a competent and independent professional advisor." *Exelon Corp. v. Commissioner of Internal Revenue*, 906 F.3d 513, 528 (7th Cir. 2018). However, the "reliance on the advice of a professional does not necessarily establish that a taxpayer exercised ordinary business care and prudence." 86 Ill. Adm. Code 700.400(c), amended at 25 Ill. Reg. 5,038 (eff. Mar. 19, 2001). " '[T]he reliance must have been reasonable in light of the circumstances. This is a fact-specific determination with many variables, but the question turns on the quality and objectivity of the professional advice obtained.' " *Exelon Corp.*, 906 F.3d at 528 (quoting *American Boat Co. v. United States*, 583 F.3d

471, 481 (7th Cir. 2009)).

¶ 72    Mueller's independence and objectivity are questionable and open to debate, given the fact that he was a member of PepsiCo's tax department at the time PGM was created and FLNA was classified as an 80/20 company. The Tribunal noted that "PepsiCo provided no documentation reflecting any opinion or advice from any outside law firm or accounting firm on these matters."

¶ 73    In addition, the Tribunal determined that the statements in Mueller's certification were conclusory and provided no information or details as to how the tax department arrived at its determination that it was a reasonable business decision to classify FLNA as an 80/20 company. The Tribunal stated that "[d]espite the sophistication of the tax department and Mueller, not a single internal memorandum, document, or even a scribbled note reflecting any deliberative process or legal research was generated that questioned or tested PGM LLC's viability considering its lack of economic reality." The Tribunal reasoned that the exclusion of approximately $2.5 billion in annual profits from PepsiCo's unitary business group's income and the elimination of its Illinois state tax liability for the three tax years at issue should have "set off alarm bells in the tax department that the structure of PGM LLC should, at a minimum, be scrutinized in-depth to insure it was a viable strategy."

¶ 74    PepsiCo claims that prior to the formation of PGM, it classified a previous entity, Beverages Foods & Services Inc. (BFSI), as the expatriates' employer. Therefore, it had "no reason to believe" that the Department would reject its classification of PGM as the expatriates' employer. The record, however, contains no evidence indicating whether BFSI was ever an employer of the expatriates under the relevant regulations.

¶ 75    PepsiCo suggests that the imposition of penalties would violate equal protection because the Department did not assess penalties in the case of *Zebra*, 344 Ill. App. 3d 474. The Tribunal

allowed the Department to file a surreply in response to this argument. The Department explained to the Tribunal that, under the statute in effect at the time of the *Zebra* appeal, penalties were not assessed unless a taxpayer failed to pay once all appeals were concluded. No late penalties were assessed against the taxpayer in *Zebra*, because the taxpayer paid its tax assessment after it lost on appeal. The Department noted that the current penalty statute assesses a penalty when the Department concludes its audit and issues a tax assessment. Faced with these explanations, PepsiCo withdrew its equal protection claim before the Tribunal.

¶ 76   As PepsiCo withdrew its equal protection claim before the Tribunal, it is waived on appeal. See, *e.g.*, *People v. Ratliff*, 2024 IL 129356, ¶ 21 (constitutional claims may be waived); *Petey's Two Real Estate, LLC v. Goedert*, 2024 IL App (1st) 220960, ¶ 35 ("waiver is the intentional relinquishment or abandonment of a known right or privilege").

¶ 77   Moreover, even if PepsiCo's equal protection claim had not been waived, we would find that no constitutional violation occurred. The decision in *Zebra* is distinguishable from the instant case both on its facts and the applicable statutes and regulations. The parties here would not be subject to the same equal protection analysis as the parties in *Zebra*. The fact that *Zebra* involved the 80/20 rule does not render it analogous with respect to abating late payment penalties under the facts in this case.

¶ 78   In sum, we believe that PepsiCo failed to demonstrate that it exercised ordinary business care and prudence when it formed PGM and then treated FLNA as an 80/20 company for purposes of calculating its Illinois state income taxes. We note, as the Tribunal stated:

"It is astounding that a sophisticated tax department, like PepsiCo's, would create such an aggressive tax strategy to create a non-operational shell company, PPM [*sic*] LLC, whose sole purpose was to make billions of dollars of FLNA's domestic snack line income,

previously recognized for State of Illinois income tax calculations, disappear with a few strokes of a pen, without addressing the merits of such an endeavor with in-depth factual and legal analyses."

¶ 79    We find that the Tribunal's decision to uphold the late payment penalties imposed by the Department was not against the manifest weight of the evidence.

¶ 80                                III. CONCLUSION

¶ 81    For the foregoing reasons, we affirm the Tribunal's judgments.

¶ 82    Affirmed.

*PepsiCo, Inc. & Affiliates v. Department of Revenue*, 2025 IL App (1st) 230913

| | |
|---|---|
| **Decision Under Review:** | Petition for review of order of Illinois Independent Tax Tribunal, Nos. 16-TT-82, 17-TT-16. |
| **Attorneys for Appellant:** | Catherine A. Battin and Jane Wells May, of McDermott, Will & Emery LLP, of Chicago, for petitioner. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Leigh J. Jahnig, Assistant Attorney General, of counsel), for respondents. |